UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Cyerra R. Springer,

       Plaintiff,

v.                                   Case No. 17-11413

Megan J. Brennan, Postmaster General      Sean F. Cox
of the United States,                    United States District Court Judge

       Defendant.
_____/

**OPINION & ORDER**
**GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

     Plaintiff Cyerra R. Springer ("Plaintiff") brought this employment discrimination and

retaliation action against the United States Postal Service. The matter is currently before the

Court on Defendant's Motion for Summary Judgment, following the close of discovery. The

parties briefed the issues and the Court heard oral argument on September 20, 2018. For the

reasons set forth below, the Court shall GRANT the motion and dismiss this action.

**BACKGROUND**

     On May 3, 2017, Plaintiff brought this employment discrimination and retaliation action

against Defendant Megan Brennan, Postmaster General of the United States. By virtue of a First

Amended Complaint filed on July 18, 2018, Plaintiff now asserts the following claims in this

action: 1) "Color Discrimination in Violation of Title VII" wherein Plaintiff alleges that

Defendant discriminated against her based upon her light-skinned complexion (Count I); 2)

"Race Discrimination in Violation of Title VII" wherein Plaintiff alleges that she is of "African-

American, Hispanic, Irish and Native American heritage" and that her race was a determining

1

factor as to adverse employment actions taken against her because Defendant and its employee Jeanette Powell have a predisposition against "mixed race African Americans" (Count II); 3) "Gender Discrimination in Violation of Title VII" wherein Plaintiff alleges that she is a female and that her gender, and her shapely figure, were a determining factor in Defendant's decision to subject her to adverse employment actions (Count III); 4) "Retaliation in Violation of Title VII" wherein Plaintiff alleges that she was retaliated against after she filed an informal EEO complaint (Count IV); 5) "Hostile Work Environment – Harassment in Violation of Title VII" wherein Plaintiff alleges that her "race, color and/or gender were determining factors in Defendant's creation of a hostile work environment" (Count V); and 6) "Hostile Work Environment – Sexual Harassment in Violation of Title VII" wherein Plaintiff alleges that she experienced a hostile work environment due to sex.  (Count VI).

Following the close of discovery, Defendant filed a Motion for Summary Judgment.  This Court's practice guidelines, which are expressly included in the Scheduling Order issued in this case, provide, consistent with Fed. R. Civ. P. 56, that:

> a.  The moving party's papers shall include a separate document entitled Statement of Material Facts Not in Dispute.  The statement shall list in separately numbered paragraphs concise statements of each undisputed material fact, supported by appropriate citations to the record. . .
>
> b.  In response, the opposing party shall file a separate document entitled Counter-Statement of Disputed Facts.  The counter-statement shall list in separately numbered paragraphs following the order or the movant's statement, whether each of the facts asserted by the moving party is admitted or denied and shall also be supported by appropriate citations to the record.  The Counter-Statement shall also include, in a separate section, a list of each issue of material fact as to which it is contended there is a genuine issue for trial.
>
> c.  All material facts as set forth in the Statement of Material Facts Not in Dispute shall be deemed admitted unless controverted in the Counter-Statement of

Disputed Facts.

(D.E. No. 60 at 2-3). In compliance with those guidelines, along with Defendant's Motion for Summary Judgment, Defendant filed a Statement of Material Facts ("Def.'s Stmt."), and in response, Plaintiff filed a "Counter-Statement of Disputed Facts" ("Pl.'s Stmt.").

Plaintiff was hired by the United States Postal Service ("USPS") in October of 2014, as a mail processing clerk at the Metroplex facility in Pontiac, Michigan. (Def.'s & Pl.'s. Stmts. at ¶ 1). As a mail processing clerk, Plaintiff fed mail into machines that sorted the mail for delivery. (*Id*. at 4).

Plaintiff was hired as a Postal Support Employee ("PSE"), rather than a regular employee. A PSE is a flexible position that does not have a set schedule and can be moved around to accommodate the need of the USPS. (*Id*. at ¶ 2).

The Metroplex facility has multiple shifts, including: 1) a shift from 2:00 p.m to 10:30 p.m.; and 2) a shift from 6:00 p.m. to 2:30 a.m. (Pl.'s Dep. at 11). When Plaintiff first started, she was assigned to shift that began at 6:00 p.m. (Pl.'s Dep. at 12).

The Metroplex has a universal dress code that prohibits, as to bottom garments, "tight fitting or stretch pants/leggings (including yoga)." (Def.'s Ex. 3). It also states that "[p]ants are not to be worn so as to show skin and/or undergarments." (*Id*.). As to top garments, it prohibits "Strapless, spaghetti straps, and tank tops with shoulders less than two (2) inches." (*Id*.). The policy provides that "[f]ailure to comply with this policy may result in being sent home to change to proper attire on your own time and/or corrective disciplinary action." (*Id*.).

It is undisputed that Plaintiff repeatedly violated the dress code by wearing leggings and unitards to work. (Def.'s & Pl.'s. Stmts. at ¶ 6). Plaintiff describes a unitard as a one-piece,

spandex, form-fitting garment.  (Pl.'s Dep. at 15).

Several managers received complaints about Plaintiff's inappropriate dress from other employees.  (Def.'s & Pl.'s. Stmts. at ¶ 8).  A number of supervisors, male and female, addressed Plaintiff about her inappropriate attire and sent her home to change.  (Def.'s & Pl.'s. Stmts. at ¶ 13).

Plaintiff testified that in March of 2015, Supervisor Jeanette Powell approached Plaintiff about what she was wearing:

> Q. And what do you remember?
> A. That was by Jeanette Powell.  I was at a machine. This was machine 610. And she was standing behind my machine and she called me over.  And I went over to her.  And she said – she was irate, she said, Cyerra, I can't take it anymore.  She said, men are complaining to me.  She said that I look like I was dressed to go to the club.  And she said, let me ask you a question.  If a man comes up to you called you a bitch or a ho don't you expect me to step in and say something for you.  And she said, if I had that on I would look like you too.  And she said, I'd have a smaller waist, a bigger butt and wider hips.  And she said, I'm going to let management know that I will send you home every time you come dressed this way. . .

(Pl.'s Dep. at 14-15).

In September of 2015, Plaintiff sought EEO counseling claiming that Angela Williams-Dial and other managers who had addressed her for dress code violations were harassing her and targeting her for enforcement of the dress code because of her shapely body.  (Def.'s & Pl.'s. Stmts. at ¶ 14).  In connection with that 2015 EEO counseling, Plaintiff claimed that two of her supervisors inquired whether she was wearing underwear and the supervisors were later advised it was inappropriate to ask an employee about undergarments and they apologized.  The only incident in the 2015 EEO that involved Powell was that single incident where Plaintiff was wearing a unitard at work and Powell warned Plaintiff she would send her home if she wore it

again.  (Def.'s & Pl.'s. Stmts. at ¶ 15-16; Pl.'s Dep. at 14-16 & 22).  Powell was not interviewed as part of the 2015 EEO and was unaware Plaintiff had filed an EEO in 2015.  (Def.'s & Pl.'s. Stmts. at ¶ 18).

Plaintiff's 2015 EEO was resolved in mediation with a settlement agreement, prior to the filing of a formal EEO Complaint.  (Def.'s & Pl.'s. Stmts. at ¶ 19).  Plaintiff agreed to abide by the dress code going forward and supervisor Williams-Dial agreed to have an open door policy for Plaintiff to discuss any issues.  Williams-Dial also agreed, as part of the settlement, to have a follow-up meeting with Plaintiff thirty days later to discuss any issues.  Plaintiff did not report any issues at that meeting.  (Def.'s & Pl.'s. Stmts. at ¶ 20).  But at the January 2016 meeting, Plaintiff did verbally request that she be moved to the shift that started at 2:00 p.m., so that she could help care for her father, after her mother had been in an automobile accident and had her shift changed.  (Pl.'s Dep. at 31-32).  Plaintiff testified that she and Williams-Dial did not discuss whether that shift change would be temporary or permanent.  (Pl.'s Dep. at 74-75).

In February of 2016, manager Jeanette Powell moved from midnights to the afternoon shift where Plaintiff was working, and Williams-Dial moved to the day shift.  Powell testified that they needed more people on the 6 p.m. shift, and that Williams told her that Plaintiff, and two other employees, had been assigned by her to the 2 p.m. shift on a temporary basis.  (Powell Dep. at 154-55).  Powell then returned all PSE employees who were on temporary reassignment to the 2 p.m. shift back to the 6 p.m. shift.  (Powell Decl., D.E. No. 21-22).  On April 21, 2016, Powell told Plaintiff that she had to return to 6 p.m. shift. (Def.'s & Pl.'s. Stmts. at ¶ 52).

Plaintiff testified that Powell told her she had to return to the shift that started at 6 p.m. unless she could find someone to switch with her.  (Pl.'s Dep. at 75).

The following day, Plaintiff sent a letter to the plant manager Brian Fisher requesting to remain on the 2:00 p.m. shift, and complaining that Powell was harassing her. (Def.'s & Pl.'s. Stmts. at ¶ 53). Fisher asked Richelle Jones, Manager of Distribution Operations, to investigate (D.E. No. 21-16). Powell explained to Jones that she was returning PSEs to their assigned shifts and that Plaintiff was not happy about returning to that shift. (Powell Dep. at 76-78). Jones submitted a written report to Fisher on April 27, 2016 that stated:

> I have reviewed the letter from Cyerra Springer and my findings are as follows:
>
> Cyerra Springer's mother works midnights and Cyerra needs to be home to take care of her bed-ridden father.
>
> When management was made aware of the situation Cyerra was given a temporary change of schedule allowing her to come in at 1400. This change was not to exceed 30 days per Angie Williams, Al Washington, and Davina Bolton.
>
> It was brought to Jeanette's attention by other employees senior to Ms. Springer that she was on this revised schedule. Other senior employees put in requests to start at 1400 but were denied. I guess the 1400 start time is a preferred start time.
>
> Coming from tour 1 Jeanettte was not aware that Cyerra was on a revised schedule. Jeanette became aware when she was approached by other employees. Once she was made aware Jeanette put Ms. Springer on notice notifying her that she had to resume her normal scheduled start time which is 1800. Jeanette also gave her the option to find a person to do a mutual exchange with.
>
> If Cyerra has to be at home at night to care for her father not sure what that has to do with her starting at 1800. She is not an excellent worker. This employee has been sent home several times by different supervisors and managers due to inappropriate dress.
>
> We have accommodated Cyerra. The original request for accommodation was temporary. She is now trying to make this into a permanent arrangement. This is not fair to the other employees who would like to change their start time. Cyerra is not the only employee with a critically ill parent. Several employees are faced with being the caregiver for their parents.

(D.E. No. 21-15).

It is undisputed that Fisher did not grant Plaintiff's written request for a reassignment to the shift that started at 2 p.m.

Plaintiff testified that on April 25, 2016, she was wearing form-fitting, polyester pants at work and that Powell sent her home to change her pants. (Pl.'s Dep. at 79). Powell did not issue any written documentation or discipline as to sending Plaintiff home that day. (*Id*. at 80). In fact, Plaintiff has never been written up for a dress code violation by any supervisor. (Pl.'s Dep. at 92). But Plaintiff testified that she lost approximately a half hour of wages on April 25, 2016, by virtue of having to go home and change her pants. (*Id*. at 80-81).

Plaintiff testified that other female employees had been wearing form-fitting leggings that same day, that Powell saw those women because she had spoken with them, but that Powell did not send those women home to change their pants. (Pl.'s Dep. at 79–83).

On July 27, 2016, Plaintiff filed a formal EEO Complaint against the USPS, identifying Powell as the person who discriminated against her, based upon color, sex, and retaliation. (Def.'s & Pl.'s. Stmts. at ¶ 86; Pl.'s Ex. V). Plaintiff alleged that the discriminatory acts took place between March 27, 2016 and July 27, 2016. (*Id*.).

Plaintiff was later permitted to move to the shift that started at 2 p.m., in September of 2016, when new PSEs where hired that would be placed on the shift that started at 6 p.m. (Def.'s & Pl.'s. Stmts. at ¶ 58; Pl.'s Dep. at 78).

Plaintiff has not worked with Powell since September of 2016. (Def.'s & Pl.'s. Stmts. at ¶ 87).

A Final Agency Decision was issued on February 3, 2017, finding Plaintiff failed to establish her claims asserted in her July 27, 2016 EEO Complaint. (Def.'s & Pl.'s. Stmts. at ¶

88; Def.'s Ex. 23).

On May 3, 2017, Plaintiff filed this action.

In July of 2017, Plaintiff was promoted to a regular U.S. Postal employee and began

working at the Customer Care Center in Troy, Michigan. (Def.'s & Pl.'s. Stmts. at ¶ 89).

Plaintiff indicates that she no longer works for the USPS. (*See* Pl.'s Stmt. at ¶ 89)

("Plaintiff disputes that she is currently an employee of Defendant.").

During discovery, Plaintiff testified that she heard Powell refer to her as "Little Lady" or

"Miss Lady" at the workplace but that she did not take those as derogatory names:

> Q. Did you ever hear Ms. Powell call you by anything other than your name?
> A. Yes.
> Q. What did you hear her call you?
> A. Little Lady. Miss Lady. That's what I can recall.
> Q. Did you ever hear her refer to anybody else as Little Lady or Miss Lady or names that you would put in that same category?
> A. Yes.
> Q. Who else has she called by those names?
> A. The only person I can recall is Bianca Patterson.
> Q. Did you take those names, Little Lady or Miss Lady to be derogatory?
> A. No.

(Plaintiff's Dep. at 84-85).

Plaintiff further testified that a co-worker told her that someone else had heard that

Powell had referred to Plaintiff as "Miss Pussy:"

> Q. So Nandi Ave told you that she heard someone else say that they heard Ms. Powell refer to you as Miss Pussy?
> A. Correct. In front of the supervisors as well as the employees.
> Q. What employees did she say that in front of?
> A. Nandi did not tell me who told her. She just said she was speaking to a couple of the employees and they told me this information.
> Q. Did she tell you anything else about that conversation?
> A. Just that. That she was calling me that.

(*Id.* at 86-87).

Jacqueline Smith, a supervisor at the Metroplex, testified that she told Plaintiff that

Powell had referred to her as "Pussy" or "Miss Pussy."  (Smith Dep. at 109).  Smith testified as

follows:

> Q.    To the best of your knowledge, did Ms. Powell call her by this nickname
>       in front of people other than just yourself?
> A.    I can't say yes or no.  I can say it was said on the floor and anybody could
>       have been around, walked past, you know.
> Q.    Did she say it in a hushed tone?
> A.    I don't think Jeanette has a hushed tone. No.
> . . . .
> Q.    Was she, to the best of your remembrance, trying to prevent other people
>       from hearing her call Ms. Springer this particular nickname?
> A.    I don't think so.
> Q.    And I've heard the nickname two different ways so let me ask you, was
>       the nickname Pussy or Ms. Pussy or both?
> A.    Both.
> Q.    Did Ms. Powell ever indicate why she calls Ms. Springer Pussy or Ms.
>       Pussy?
> A.    I didn't ask her.  I didn't want her to call her that in that [sic] my presence.
>       I didn't think it was nice. And I let her know.
> Q.    Have you ever witnessed Ms.  Powell say it in front of other supervisors,
>       call Ms. Springer that nickname?
> A.    That I'm not very sure of.
> Q.    Did Ms. Powell have nicknames for other employees?
> A.    Some.
> Q.    What were those nicknames and for whom?
> A.    I can only think of one or two.  I know Tinysha she used to call fat ass.  I
>       can't think – I think she called Ms. Jackie that, too.  There was another
>       employee named Jackie.
> Q.    Fat ass?
> A.    Yes.
> Q.    What about nicknames for the men?
> A.    Not that I can recall.

(Smith Dep. at 109-111).

Jacqueline Smith testified that she has seen some male employees wear "sagging pants"

9

such that, at times, the man's underwear could be seen when the man would bend over. (Smith Dep., Ex. C to Pl.'s Br., at 83-85). Smith testified that she would tell men with sagging pants to pull up their pants and keep them pulled up. (*Id*. at 86 & 106). Smith testified that she did not send any men home from work because of sagging pants. (*Id*. at 86). Smith testified that "wife beater t-shirts," t-shirts with less than two inches in the shoulders, violate the dress code. (*Id*. at 86-87). Smith further testified that she never sent any employees home from work for dress code violations. (*Id*. at 98).

Supervisor Angela Williams-Dial testified as follows regarding dress code violations by male employees:

> Q. To the best of your knowledge has there ever been a male employee sent home for violation of the dress code?
> A. No, because the male, usually we got dress code with wearing those white beaded T-shirts they like to wear. Normally if we see somebody like that, we tell them to put their shirt back on. They go to their locker and just put their shirt back on. We haven't had to send a male home.
> Q. What about the sagging pants where you can see their back of their underwear, what about those?
> A. We ask them to pull them up, and they pull them up. And we tell them, you know, if we catch them sagging again, they could face discipline. But normally when I tell them to pull them up, they pull them up. We haven't had an issue out with the males.
> Q. So, it would be the men's understanding that they would be sent home if you saw them with sagging pants again?
> A. Right.
> Q. But as long as you don't see them, it's okay?
> A. Well, if they caught, they got to be dealt with.

(Ex. G to Pl.'s Br. at 52-53).

Powell submitted a Declaration that states that she has verbally reprimanded male employees with dress code violations. (*See* Powell Decl., D.E. No. 21-22). Powell's declaration further states that she has not sent any male employees home for dress code violations because

10

the violations she has encountered with males "were able to remedied without such action."

(*Id*.).

## STANDARD OF DECISION

Summary judgment will be granted when no genuine issue of material fact exists. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The Court "must view the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the non-moving party." *Skousen v. Brighton High Sch*., 305 F.3d 520, 526 (6th Cir. 2002).

Under Fed. R. Civ. P. 56(c)(4), an "affidavit or declaration" used to support or oppose a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Moreover, it is well-established that the court may not consider unsworn statements when ruling on a motion for summary judgment. *Dole v. Elliot Travel & Tours, Inc.,* 942 F.2d 962, 968-69 (6th Cir. 1991).[1]

Here, Plaintiff's response to Defendant's Summary Judgment attaches several unsworn statements, that do not come within the statutory exception provided under § 1746. (*See,* e.g., Exhibit L to Pl.'s Br.). The Court cannot consider any of those unsworn statements in connection with this motion.

## ANALYSIS

---

[1]By statute, an unsworn declaration may substitute for a conventional affidavit – but only if the statement contained in the declaration is made under the penalty of perjury and verified as true and correct. 28 U.S.C. § 1746.

Defendants' Motion for Summary Judgment challenges all claims asserted by Plaintiff in this action.

## I.       Challenges Plaintiff Failed To Respond To In Her Brief

Notably, Plaintiff did not respond to all of the challenges in Defendant's pending Motion for Summary Judgment.

### A.       Plaintiff's Claims For Discrimination/Harassment Based On Color Or Race

As its first Challenge, Defendant contends that it is entitled to summary judgment as to Plaintiff's claims for discrimination and harassment based on race and color because Plaintiff failed to exhaust her administrative remedies as to those claims.  (Def.'s Br. at 2).

Plaintiff's response brief does not respond to that challenge.  At the September 20, 2018 hearing, Plaintiff's Counsel conceded that those counts fail for failure to exhaust.  As such, the Court shall dismiss Counts I and II.

### B.       Plaintiff's Retaliation Claim

Next, Defendant contends that it is entitled to summary judgment as to Plaintiff's retaliation claim (Count IV) because Plaintiff cannot establish a prima facie case or pretext. Defendant contends that Plaintiff cannot establish a prima facie case of retaliation because she cannot establish that Powell was aware of her EEO activity.  Defendant contends that Plaintiff cannot establish pretext because Plaintiff has no evidence to show that Powell had a retaliatory motive for addressing Plaintiff about work-related issues.

Again, Plaintiff's brief does not respond to those arguments.  At the September 20, 2018 hearing, Plaintiff's Counsel conceded that her retaliation claim fails.  Thus, the Court will grant summary judgment in Defendant's favor as to that claim.

### C.     Plaintiff's "Sex-Plus" Theory Of Gender Discrimination Claim

In her First Amended Complaint, Plaintiff asserted that she was discriminated against based on her gender, combined with her shapely figure.  In its Motion for Summary Judgment, Defendant challenges Plaintiff's ability to proceed with a "sex plus" theory of gender discrimination.

Plaintiff's brief does not respond to that challenge.  At the September 20, 2018 hearing, Plaintiff's Counsel confirmed that Plaintiff has abandoned her sex-plus theory of gender discrimination in this action.  Thus, Defendant is entitled to summary judgment as to that portion of Count III that is based on a sex-plus theory of gender discrimination.

## II.     Challenges That Plaintiff Responded To In Her Brief.

In response to Defendant's properly-supported Motion for Summary Judgment, Plaintiff only responds to two claims: 1) "Plaintiff asserts that she was the victim of illegal same-sex discrimination resulting in a hostile work environment" (Pl.'s Br. at 24); and 2) Plaintiff "asserts that she was the victim of gender discrimination."  (*Id.*).

### A.     Gender Discrimination

A plaintiff alleging gender discrimination under Title VII may prove her claim using either direct or circumstantial evidence. *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 775 (6th Cir. 2016).

Here, Plaintiff does not assert that she can proceed with her gender discrimination claim based on any direct evidence.  Rather, she contends that she can proceed under the circumstantial-evidence approach.

Where a plaintiff relies on such circumstantial evidence, the familiar *McDonnell*

*Douglas/Burdine* framework is used. *Id.* First, the plaintiff must establish a prima facie case of discrimination. Once she does that, the burden shifts to the defendant to offer evidence of a legitimate, non-discriminatory reason for the adverse action. If the defendant meets that burden, the burden shifts back to the plaintiff to show that the defendant's proffered reason was not its true reason, but merely a pretext for discrimination. *Id.*

### 1.    Can Plaintiff Establish A Prima Facie Case Of Gender Discrimination?

To establish a prima facie case of gender discrimination, a plaintiff must demonstrate that: 1) she is a member of a protected group; 2) she was subjected to an adverse employment action; 3) she was qualified for the position at issue; and 4) similarly-situated non-protected employees were treated more favorably. *Id.* at 776 (citing *Peltier v. United States*, 388 F.3d 984, 987 (6th Cir. 2004)).

Here, there is no dispute that Plaintiff can establish the first and third elements, as she is a member of a protected class (females) and she was qualified for her position. Rather, the dispute centers on whether Plaintiff can establish that she suffered an adverse action and that she was treated differently than similarly-situated, non-protected employees (males).

The Sixth Circuit requires a Title VII plaintiff to prove an adverse employment action "[t]o prevent lawsuits based on trivial workplace dissatisfactions." *White v. Burlington Northern & Santa Fe Rail Co.*, 364 F.3d 789, 795 (6th Cir. 2004). An adverse employment action is a "materially adverse change" in the terms of employment. *Kocis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 885 (6th Cir. 1996). Adverse employment actions are typically marked by a significant change in employment status, including hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant

change in benefits. *Spees v. James Marine, Inc*., 617 F.3d 380, 391 (6th Cir. 2010).

"Importantly, however, an individual's 'subjective impression concerning the desirability of one position over another' is insufficient to render an employer's action materially adverse.'" *Freeman v. Potter*, 200 F. App'x 439, 442 (6th Cir. 2006)(citations omitted); *Mitchell v. Vanderbilt Univ*., 389 F.3d 177, 183 (6th Cir. 2004).

To satisfy the fourth element of a prima facie case of discrimination, Plaintiff must point to a similarly-situated person outside the protected class who received more favorable treatment. The plaintiff and the employees with whom the plaintiff seeks to compare herself must be similar in all of the *relevant* respects. *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994). Factors to consider include whether the individuals dealt with the same supervisor, were subject to the same standards, engaged in the same conduct "without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992). Thus, to meet her burden of demonstrating that another employee is similarly-situated, Plaintiff must show that there is someone who is directly comparable to her in all material respects. *In re Tribune Media Company,* __ F.3d __, 2018 WL 4212086 at * 13 (6th Cir. 2018).

In her response brief, Plaintiff asserts that as to her gender discrimination claim she "experienced *multiple* adverse employment actions." (Pl.'s Br. at 16) (emphasis added). At the hearing, this Court asked Plaintiff to specify each and every alleged adverse action that Plaintiff allegedly suffered due to gender discrimination. Plaintiff's Counsel identified the following: 1) being verbally reprimanded for a dress code violation; 2) being sent home from work to change her clothes for a dress code violation; and 3) not being permitted to transfer to the shift that

started at 2 p.m.[2]

       **a.**       **Can Plaintiff Establish A Prima Facie Case Of Gender Discrimination Based Upon Verbal Reprimands / Being Sent Home For Dress Code Violations?**

Plaintiff's First Amended Complaint asserts that Plaintiff received "verbal reprimands regarding her attire" and was sent "home without pay" for such alleged violations. (First Am. Compl. at ¶ 15).

Receiving a verbal reprimand for violating the dress code, with no accompanying disciplinary write-up or any other consequences such as loss of pay, is not an adverse action for purposes of a gender discrimination claim under Title VII. Plaintiff's Counsel conceded so at the hearing.

Plaintiff also asserts that she was home to change her clothes for violating the dress code. Plaintiff asserts that she "was sent home to change clothes for dress code violations on more than one occasion." (*Id.*). But the only relevant[3] and exhausted EEO Complaint is the July 27, 2016 EEO Complaint, which identified Powell as the person who discriminated against her between March 27, 2016, and July 27, 2016.

Plaintiff testified that Powell sent her home from work, because of a dress code violation, on a single occasion. Plaintiff testified that on April 25, 2016, she was wearing form-fitting

---

[2]Plaintiff's First Amended Complaint also alleged that Plaintiff was refused overtime, and forced to work harder than other employees, but she has abandoned those claims. (First Am. Compl. at ¶ 126).

[3]Plaintiff had filed a prior EEO in 2015, in which she complained about several managers harassing her about the dress code because of her shapely body. That EEO, however, was resolved via a settlement agreement. Thus, Plaintiff cannot assert claims in this action based on those alleged events.

polyester pants at work and that Powell sent her home to change her pants. (Pl.'s Dep. at 79). Powell did not issue any written documentation as to sending Plaintiff home that day. (*Id*. at 80). In fact, Plaintiff has never been written up for a dress code violation. (Pl.'s Dep. at 92). But Plaintiff testified that she lost approximately a half hour of wages on April 25, 2016, by virtue of having to go home and change her pants. (*Id*. at 80-81).

It is questionable whether the loss of a half hour of wages, due to being sent home to change clothes for an admitted dress code violation on a single occasion, with no disciplinary action or other consequences, rises to the level of a adverse action for purposes of a Title VII gender discrimination claim. That is because employment actions that are de minimis are not actionable under Title VII. *White v. Burlington N. & Santa Fe R. Co.*, 364 F.3d 789, 795 (6th Cir. 2004).

Assuming *arguendo* that it does, in order to establish a prima facie case, Plaintiff still has to show that a similarly-situated, non-protected employee (a male)[4] engaged in the same conduct but was treated more favorably. She has not done so. Plaintiff has not identified any males who engaged in the same conduct, repeatedly violating the dress code by wearing form-fitting spandex or polyester pants, but were not sent home to change their pants.

Rather, Plaintiff suggests that men were treated more favorably because they violated the dress code but were not sent home to change their clothes. But the only testimony regarding dress code violations committed by men relate to violations for sagging pants, or wearing "wife-

---

[4]Plaintiff testified that other *females* were wearing leggings on the same day that Powell sent her home to change, and that Powell did not send those women home to change. That does not aid Plaintiff's gender discrimination claim because those female employees are in the same protected class as Plaintiff. Thus, they are not similarly-situated, *non-protected* employees who were treated more favorably.

beater" undershirts. And the testimony also reflects that those are different types of violations because they can be remedied on the spot, by having the employee pull up their pants/tighten their belt, or have the employee go back to their locker and put their outer shirt back on.

Accordingly, the Court concludes that Plaintiff cannot establish a prima facie case of gender discrimination based on verbal reprimands or being sent home to correct her dress code violation on April 25, 2016.

### 2.    Being Denied A Request For Shift Change

Plaintiff also alleges that she incurred an adverse employment action in that she was refused a shift change. (First Am. Compl. at ¶ 124).

In its motion, Defendant asserts that "Plaintiff has no evidence that she submitted a request to switch her shift to Powell and it was denied, or that a person with lower seniority was permitted a reassignment to the 2:00 shift after Plaintiff was moved." (Def.'s Br. at 13).

In response, Plaintiff does not direct the Court to any evidence to establish that she submitted a shift change request to Powell. (*See* Pl.'s Br. at 16). Rather, Plaintiff directs the Court to a letter that Plaintiff wrote to the plant manager, asking for a shift change. (D.E. No. 21-14). It is undisputed that the plant manager did not grant Plaintiff's request for a shift change.

Among other things, Defendant asserts that a failure to grant a shift change request does not constitute an adverse action and directs the Court to *Barrett v. Lucent Techs., Inc*., 36 F. App'x 835, 842 (6th Cir. 2002). In that case, the Sixth Circuit explained that "a refusal to grant a change requested by an employee is not an adverse employment action unless the employee has a right to the requested change by law or through the terms and conditions of his employment," and concluded that because "plaintiff has offered no evidence that she had a right,

either legally or under the company's policies and practices, to a transfer," the failure to grant her transfer request "does not constitute an adverse employment action."

It does not appear that being denied a request for a four-hour shift change, under the unique circumstances presented here, could constitute an adverse employment action. Notably, at the relevant times Plaintiff was employed by Defendant as a PSE – not a regular postal employee. It is undisputed that a PSE "is a flexible position that *does not have a set schedule and can be moved around to accommodate the need fo the USPS*." (Def.'s & Pl.'s. Stmts. at ¶ 2) (emphasis added). Moreover, Plaintiff was later reassigned to her preferred start time of 2 p.m. in September of 2016. Thus, she only remained on the shift that started at 6 p.m. for approximately four months following her shift change request to the plant manager.

Moreover, even if Plaintiff could establish that the denial of her request constitutes an adverse action, Plaintiff would still have to show that a similarly-situated, non-protected employee was treated better than she was. It is Plaintiff's burden to present admissible evidence to establish that the person she seeks to compare herself with is directly comparable to her in all material respects. *In re Tribune Media Company*, __ F.3d __, 2018 WL 4212086 at * 13 (6th Cir. 2018).

Plaintiff identifies Eugene Frazier as the similarly-situated, non-protected employee who was treated more favorably than her. (Pl.'s Br. at 17). Plaintiff asserts that Frazier "received seniority number 166" and that she "was seniority number 137. As such, Plaintiff had higher seniority than Frazier. (Ex. I, Powell at 253)." (Pl.'s Br. at 17-18). But Plaintiff has not directed the Court to any admissible evidence as to Frazier's seniority number. Rather, Plaintiff directs the Court to page 253 of Powell's deposition transcript but that page discusses whether Plaintiff

had more seniority than a *female* co-worker, "Miss Crawford" (Powell Dep. at 253), not Eugene Frazier.

Moreover, Plaintiff has not directed the Court to any evidence that shows whether Frazier was hired as a PSE or a regular employee, or any evidence that shows whether Frazier was originally assigned to the shift that started at 2 p.m.

Accordingly, the Court concludes that Plaintiff has not shown that a similarly-situated, non-protected employee was treated more favorably.

### A.    Same-Sex Discrimination Resulting In Hostile Work Environment

Plaintiff also asserts that "she was the victim of illegal same-sex discrimination resulting in a hostile work environment." (Pl.'s Br. at 24).

The parties agree that to establish a hostile-work-environment claim, a plaintiff must show that: 1) she was a member of a protected class; 2) she was subject to unwelcomed harassment; 3) the harassment was based on her sex; 4) the harassment created a hostile work environment; and 5) the existence of employer liability. *Williams v. General Motors Corp.*, 187 F.3d 553, 560 (6th Cir. 1999).

### 1.    Can Plaintiff Show The Alleged Harassment Was Based On Sex?

"In same-sex sexual harassment cases, the Supreme Court has explained three ways to demonstrate that the harassment was 'based on' sex:" 1) where the harasser is acting out of sexual desire; 2) where the harasser is motivated by general hostility to the presence of women in the workplace; and 3) where the plaintiff offers "direct comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace." *Wade v. Automation Personnel Svs., Inc.*, 612 F. App'x 291, 296 (6th Cir. 2015) (quoting *Oncale v. Sundowner*

20

*Offshore Servs., Inc.*, 523 U.S. 75, 80-81 (1998)); *see also Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 467-68 (6th Cir. 2012). "Whatever route the plaintiff chooses to follow, he or she must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted 'discrimination . . . because of . . . sex.'" *Oncale*, 523 U.S. at 81.

Here, Plaintiff no longer[5] contends that Powell was acting out of sexual desire for her. Rather, in opposing the pending motion, Plaintiff only seeks to proceed "under the second and third methods." (Pl.'s Br. at 3).

### a.    General Hostility To Women

In seeking summary judgment, Defendant asserts that there is no admissible evidence to indicate that Powell used derogatory terms that could show hostility to women.

Plaintiff acknowledges that in order to establish a same-sex harassment claim under the second method, she "must establish that a woman harassed other women 'in such sex-specific and derogatory terms . . . as to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace.'" (Pl.'s Br. at 3-4) (quoting *Baugham v. Battered Women, Inc.,* 211 F. App'x 432, 439 (6th Cir. 2006)). Plaintiff asserts that "[e]vidence that a female plaintiff was subjected to epithets like 'slut' and 'fucking women'" is sufficient. (*Id.*).

Plaintiff's Brief then directs the Court to several unsworn statements to try to establish that Powell used the terms bitch, hoe, and slut, to refer to women at the workplace. (Pl.'s Br. at 4-5) (directing the Court to Pl.'s Exs. L, M, and N). But those are all unsworn statements.

For example, Plaintiff's Exhibit L is a statement that appears to be authored by Plaintiff

---

[5]During her deposition, Plaintiff testified that she believed the Powell was sexually attracted to her. (Pl.'s. Dep. at 98).

that states, "As my coworker Jackie was walking down the aisle she overheard Jeanette bad mouthing me to another supervisor Daneen Burch. Jeanette used the words 'that little bitch Cyerra . . .' Jackie kept walking and did not hear the full conversation." (Ex. L to Pl.'s Br.). It appears that Plaintiff had her co-worker sign that statement. But it is not notarized or signed as required by § 1746.

Before ruling on the pending summary judgment motion, the Court must "first determine what is (and is not) part of the summary judgment record." *Lloyd v. Midland Funding, LLC*, 639 F. App'x 301, 304 (6th Cir. 2016). As the Sixth Circuit has explained, a few basic principles guide that inquiry: "Civil Rule 56(c)(4) requires affidavits filed to support or oppose a motion to "set out facts that would be admissible in evidence." Fed. R. Civ. P. 56(c)(4). Documents that fail to do so may be disregarded on summary judgment. *See id.* 56(e)." *Id.* 56(c)(4); *see also* Federal Practice and Procedure, Civil 2d § 2738 (1983)( Courts have the discretion to strike conclusory and speculative affidavits).

As Defendant notes, "[i]n order to rely on a written statement to support summary judgment, the statement must either be in the form of an affidavit, or provide that it is made under penalty of perjury in accordance with 28 U.S.C. §1746(2)" and "[n]one of the statements Plaintiff relies on for animus are sworn or comply with 28 U.S.C. § 1746(2)" and therefore cannot be considered by the Court.[6]

---

[6] Without seeking leave to do so, the night before the summary judgment hearing, Plaintiff's counsel filed an Affidavit of Kevin Lewis (D.E. No. 42-1). A district court "has the discretion to refuse the filing of untimely affidavits." *Moore, Owen, Thomas & Co. v. Coffey*, 992 F.2d 1439, 1446 (6th Cir. 1993). Here, the affidavit was filed more than two months after the filing of Plaintiff's response brief and a month and half after Defendant's reply brief. The Court declines to consider that untimely affidavit. The untimely affidavit from Lewis states that he has "reviewed the attached Exhibit N" and that the "statements made in the document" are true. Exhibit N is a three-page narrative statement by Mr. Lewis. That statement references a

Accordingly, the Court concludes that Plaintiff cannot proceed under the second method, as she has not submitted admissible evidence to show that Powell ever used derogatory terms that show a general hostility to women in the work place.

### b.    Comparative Evidence

Plaintiff's response asserts that Plaintiff can proceed via the third method because she has evidence that Powell treated men and women differently in the work place.

As to this third method, the "critical issue" is "whether members of one sex are exposed to disadvantageous terms or conditions of employment which members of the other sex are not exposed." *Smith v. Rock-Tenn Svs., Inc*., 813 F.3d 298, 309 (6th Cir. 2016) (quoting *Oncale*, 523 U.S. at 80)).

Plaintiff's Brief first directs the Court to "Kevin Lewis' statement" (Pl.'s Ex. N).  In that unsworn statement, Kevin Lewis states that "Jeanette is very irate, aggressive and confrontational with female employees.  Harassing them and disciplining them for no reason and she's kind and sometimes flirty with the male employees (including myself)."  (*Id*.).

Plaintiff also asserts that Powell referred to women as bitches, sluts, and hoes.  But again, Plaintiff is directing the Court to unsworn statements, or hearsay testimony (Pl.'s Dep. at 99), that cannot be considered by the Court in deciding the pending motion.

Plaintiff also contends that Powell treated men more favorably then women in that she never sent a male employee home for a dress code violation.  As addressed previously, that is

---

"Jeanette" without identifying her last name or specifying where the incidents took place.  It then references various incidents, without specifying any dates, or even the years, as to when those alleged incidents took place.  In addition to being untimely, the Court concludes that this affidavit/statement does not constitute admissible evidence for multiple reasons (conclusory assertions unsupported by specific facts, speculation, etc.).

not comparable conduct because the types of dress code violations committed by the men could be cured on the spot, without sending the men home to change.

Finally, Plaintiff directs the Court to Smith's testimony, wherein Smith testified that she heard Powell refer to Plaintiff as "Pussy" or "Ms. Pussy" and she asked Powell not to call Plaintiff that. Smith further testified that she had heard Powell refer to two female employees as "fat ass," and that Smith does not recall Powell having referred to men by any nicknames. (Smith Dep. at 110-111). Accepting Smith's testimony as true, it is questionable whether that conduct, standing alone, would be sufficient to proceed under the third method.

**2.     Can Plaintiff Show That The Alleged Harassment Was Severe And Pervasive Enough To Create A Hostile Work Environment Under Title VII?**

Even if Plaintiff could show that the alleged harassment from Powell was "based on sex," Plaintiff would still have to establish that the alleged harassment was sufficiently severe and pervasive to be actionable under Title VII. She cannot do so.

Plaintiff "must overcome a high threshold to demonstrate actionable harm, for 'complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing' are insufficient to obtain relief under Title VII." *Baugham*, 211 F. App'x at 438.

"To Fall within the purview of Title VII, the workplace must 'permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment ans create an abusive working environment.'" *Id.* (quoting *Harris v. Forklift Sys., Inc*., 510 U.S. 17 (1993). Moreover, whether a hostile work environment exists is evaluated by the severity of the harassment from the perspective of a

reasonable person in the employee's shoes, considering the totality of the circumstances. *Baugham,* 211 F. App'x at 438. Appropriate factors for consideration include the frequency of the discriminatory conduct; its severity; whether is it physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *Id.*

As Defendant notes, only harassment based on sex can be considered. *Williams v. CSX Transp. Co., Inc.*, 643 F.3d 502, 511 (6th Cir. 2011). Thus, the Court must first determine what alleged harassment was based on Plaintiff's sex, and then ask whether the totality of that harassment was sufficiently severe or pervasive to create a jury question on her claim. *Id.*

Here, the evidence reflects that: 1) Powell never wrote Plaintiff up or formally disciplined her for her performance or dress code violations (Pl.'s Dep. at 91-92 & 107); 2) Powell never verbally threatened Plaintiff or made any physical contact with her (Pl.'s Dep. at 109); and 3) Plaintiff never heard Powell call her any derogatory names. (Pl.'s Dep. at 84-85).

The evidence that Plaintiff believes establishes a hostile work environment consists of the following: 1) Powell referred to Plaintiff as "Pussy" or "Ms. Pussy" to someone else on more than one occasion and it got back to Plaintiff; 2) Powell compared her body to Plaintiff's body (asserting they had similar bodies) on two occasions; and 3) Powell sent Plaintiff home for a dress code violation on one occasion when Plaintiff wore form-fitting, polyester pants to work.[7]

Accordingly, the alleged discriminatory conduct was sporadic, not frequent. There was no physically threatening conduct. And while it is inappropriate to refer to an employee as

---

[7]Plaintiff's brief references events that were the subject of her 2015 EEO that was settled, such as other supervisors asking her if she was wearing underwear, but even Plaintiff recognizes that those events cannot be considered for purposes of the claims in this action. (Pl.'s Br. at 11 n.5).

"Pussy" or "Ms. Pussy," even when considered together, the conduct Plaintiff complains of is simply not severe or pervasive enough to establish a prima facie case for a hostile work environment.  *See, eg.*, *Morris v. Oldham Cty.*, 201 F.3d 784 (6th Cir. 2000) (conduct not sufficient where it consisted of several dirty jokes, a sexual advance, referring to the plaintiff as "hot lips," and commenting about the plaintiff's state of dress); *Galeski v. City of Dearborn*, 435 F. App'x 461 (6th Cir. 2011) (conduct not severe or pervasive enough to create hostile work environment where it consisted of supervisor twice complimenting the plaintiff on his appearance, telling him about his pornography collection, telling him a crude and inappropriate story of being sexually aroused when being robbed, and telling the plaintiff that he could procure a transgender/transsexual prostitute for him.); *Hensman v. City of Riverview*, 316 F. App'x 412 (6th Cir. 2009) (conduct not sufficient where it included plaintiff's supervisor commenting about her voluptuousness twice, hugging her three times, complimenting plaintiff on her looks and perfume and sniffing her, and walking too closely behind her); *Stevens v. Saint Elizabeth Med. Ctr., Inc.*, 533 F. App'x 624 (6th Cir. 2013) (conduct not sufficient where it included the plaintiff's supervisor sending her texts expressing affective for her, saying I love you, and some unsolicited physical contact); *Grace v. NASCAR*, 521 F.3d 655 (6th Cir. 2008) (Alleged conduct not sufficient where it included the plaintiff's supervisor referring to her as a "call girl" and a "dancing girl," and ignoring her except to comment on her appearance.)  To hold otherwise would risk changing Title VII into a "code of workplace civility," a result the Sixth Circuit has rejected.  *Grace*, 521 F.3d at 679.  Defendant is entitled to summary judgment on Plaintiff's hostile work environment claim.

**CONCLUSION & ORDER**

For the reasons set forth above, IT IS ORDERED that Defendant's Motion for Summary

Judgment is GRANTED and this action is DISMISSED.

IT IS SO ORDERED.

s/Sean F. Cox
Sean F. Cox
United States District Judge

Dated:  September 27, 2018

I hereby certify that a copy of the foregoing document was served upon counsel of record on
September 27, 2018, by electronic and/or ordinary mail.

s/Jennifer McCoy
Case Manager